Rico **GADDIS**, Plaintiff,

v.

**RUSSELL CORPORATION**, Defendant.

No. CIV.A.02–A–22–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 22, 2003.

1126

Marvin L. Stewart, Jr., Birmingham, AL, for Plaintiff.

Jay D. St. Clair, Laura W. Jordan, Birmingham, AL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion for Summary Judgment (Doc. # 20) filed by Defendant Russell Corporation on October 15, 2002. The Plaintiff, Rico Gaddis, filed her Complaint in this case on January 8, 2002 (Doc # 1). The Plaintiff brings claims under Title VII for retaliation and disparate treatment on the basis of race.

For the reasons to be discussed, the Defendant's Motion for Summary Judgment is due to be GRANTED.

### II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–24, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the nonmovant:

The Plaintiff is an African–American female who began her employment with the Defendant, a manufacturer of retail and athletic apparel, on October 11, 1999. As a "Sales Forecast Analyst" in the Defendant's Atlanta office, the Plaintiff reviewed various types of data in order to forecast future sales of the Defendant's various apparel lines. As of June 2000, the Plaintiff was the only forecast analyst in the Atlanta office, thus she was responsible for analyzing both the retail and athletic clothing lines.

The Plaintiff contends that the Defendant began to discriminate against her on the basis of her race beginning in late 2000. This discrimination initially took the form of adverse employment evaluations from Randy Ballard, the Director of Supply Chain and Demand Planning and one of the Plaintiff's supervisors.[1] Ballard told the Plaintiff that she was doing a good job during informal settings, but gave her negative feedback during her formal performance evaluations, specifically her review in February 2001. Furthermore, Ballard isolated the Plaintiff in meetings by only listening to the suggestions and comments of white employees.

Additionally, the Plaintiff contends that the Defendant treated her differently from other employees with respect to vacation time. For example, the Defendant permitted a white employee, Elizabeth Robinson, to carry over her vacation days into the next year even though the Plaintiff was not allowed to do the same. Moreover, the Defendant refused to award the Plaintiff an additional week of vacation time that was due to her at her one year anniversary in October 2000.

The Plaintiff also began to have various problems with an employee in the systems department named Janet Koubek. As a forecast analyst, the Plaintiff was charged with updating the database files for various product lines as new information became available. In order to accomplish this task, the Plaintiff would update her files and submit them to a systems employee who would send the new files out to the managers. On several occasions, the Plaintiff submitted her updated files to Koubek, but Koubek changed the format of the Plaintiff's files such that they reflected the old data, not the updated data. According to the Plaintiff, these repeated errors were "forms of discrimination" because the Plaintiff was the only African–American employee in the department and Koubek intentionally singled her out in order to affect her job performance in a negative way. *See* Gaddis Affidavit, ¶¶ 99–106.

At the same time that the Plaintiff experienced these problems, the Defendant began to recruit experienced sales forecast analysts for the Atlanta office. With the Plaintiff as the only forecast analyst, the Defendant wanted to add several additional analysts in order to strengthen the company's staff. In early 2001, the Defendant hired Bill Androutsopoulos, a white male, and Ann Harrison, a white female, as "Senior Sales Forecast Analysts" because of their extensive experience in the retail industry.[2] At the time of this hiring, the Plaintiff was not aware that the Defendant was looking for any senior analysts and did not receive an interview for the position The Plaintiff believes that she was passed over for this promotion because of her race.

Once Harrison and Androutsopoulos began their employment, the Plaintiff's job responsibilities decreased. Instead of forecasting for both the retail and athletic apparel lines, the Plaintiff became responsible for the women's retail line only. Al-

---

1. As the court understands the corporate hierarchy, the Director of Supply Chain and Demand Planning, Randy Ballard, supervised the manager of the forecasting unit and all forecasting employees. During the Plaintiff's employment, Elizabeth Robinson occupied the manager position until early 2001. Beginning in February 2001, David Floum took over this position after Robinson left the Atlanta office.

2. The primary difference between a Sales Forecast Analyst and Senior Sales Forecast Analyst is the salary. A senior analyst receives a "Grade 10" salary while an analyst receives a "Grade 9" salary. In terms of work duties, both involve the same primary functions, but the senior analyst has several additional responsibilities and less supervision.

though the Plaintiff did not receive any change in pay or benefits, she considered her new assignment to be a "demotion in responsibility." *See* Gaddis Depo., p. 135. In addition to a reduction in her job duties, the Plaintiff trained Harrison and Androutsopoulos on several types of forecasting software because neither was familiar with the Defendant's computer systems. The Plaintiff believes that this lack of experience with industry software illustrates that she was the better candidate for the senior analyst position.[3]

In February 2001, the Plaintiff met with two of her supervisors to discuss the fact that the Defendant did not promote her to the Senior Analyst position. In her first meeting with Randy Ballard, the Plaintiff stated that she did not appreciate being treated differently than other employees. When asked by Ballard if she believed that this differential treatment was because of her race, the Plaintiff responded in the affirmative. *See* Gaddis Depo., p. 208. In a second meeting with Ronald Davie, a director in the human resources department, the Plaintiff said that she believed that she "was being racially attacked." *See* Gaddis Depo., p. 210. The Plaintiff contends that the Defendant engaged in a series of retaliatory acts following these complaints.

In late March 2001, the Plaintiff had a second meeting with Ronald Davie during which the Defendant placed the Plaintiff on probation for excessive absences from work. According to the Defendant's records, the Plaintiff missed thirty-two days in 2000 and fourteen days during the first three months of 2001. The Plaintiff contests the accuracy of these records because they list the Plaintiff absent on days when she states she was present at work. In addition, the Plaintiff believes that she was treated much more harshly than white employees with respect to absences from work. More specifically, the Defendant cautioned the Plaintiff regarding each and every absence, yet allowed Androutsopoulos to take extended lunch breaks and leave work frequently.

In April 2001, the Plaintiff requested to transfer her job to the Defendant's Alexander City office. The Defendant denied this transfer because the Alexander City office did not have a sales forecast analyst position available. The Plaintiff considers this denial to be retaliation for her discrimination complaints. As evidence of this claim, the Plaintiff points to the fact that her job could be performed in any location with access to the Defendant's computer server. In fact, the Plaintiff believes she would have been more productive in Alexander City because the server for the Atlanta office is located there. The Plaintiff also insists that the Defendant treated her differently than white employees who requested similar transfers. For example, the Defendant permitted Elizabeth Robinson, a white female, to transfer to the Alexander City office because her husband received a new job there. Nevertheless, the Defendant refused to give Plaintiff this same courtesy when she asked for a transfer due to the failing health of her stepmother.

On May 11, 2001, the Plaintiff took a leave of absence from work due to medical complications arising from pregnancy. In August 2001, while the Plaintiff was still on medical leave, the Defendant informed the Plaintiff that her job had been eliminated due to corporate downsizing. The impetus

---

**3.** The parties strongly disagree about the impact of this computer training. The Defendant argues that it amounted to little more than showing someone how to use a copier. The Plaintiff believes that the training was much more substantial, as she taught Harrison and Androutsopoulos how to use several software programs critical to apparel forecasting.

for this action was a corporate order to Randy Ballard that he should reduce company costs in all possible areas, including eliminating jobs. According to the Defendant, Ballard chose to eliminate the Plaintiff's position for three reasons: 1) the Plaintiff's poor job performance; 2) the Plaintiff's frequent absences from work; and 3) the Plaintiff had less experience in the apparel industry than the other members of the forecast team. Upon learning of the Defendant's decision, the Plaintiff believed that her employment with the Defendant had been terminated. Accordingly, the Plaintiff filed a complaint for race discrimination and retaliation with the EEOC on August 14, 2001.

In September 2001, the Plaintiff's health insurance carrier terminated her short-term medical benefits. According to the Plaintiff, the Defendant falsely informed the insurance company that the Plaintiff still had a job and was medically able to work. As a result of this action, the Plaintiff applied for unemployment benefits from the State of Georgia in October 2001. The Defendant opposed this action because it still considered the Plaintiff to be an employee of the company. The Defendant took the position that the Plaintiff was not entitled to such benefits because she remained on a medical leave of absence. Although her position had been eliminated and she was no longer receiving a salary, the Defendant did not believe that these actions constituted a termination of the employment relationship. Rather, the Defendant considered the Plaintiff to be an employee on a medical leave of absence who would receive the opportunity to interview for any open positions within the company once she was healthy enough to return to work. The Georgia Department of Labor ultimately rejected the Defendant's argument and awarded unemployment benefits to the Plaintiff. Nonetheless, the Plaintiff believes that the Defendant's opposition to her unemployment benefit petition was an act of retaliation that delayed the receipt of her unemployment payments and caused her mental anguish.

In March 2002, the Plaintiff informed Becky Arnoff, a human resources specialist in the Defendant's Atlanta office, that she was medically able to return to work. Although the Plaintiff told Arnoff that she would be open to accepting any position that might be available, the Plaintiff only applied for positions in the Alexander City office. After submitting her resume for several different positions, the Plaintiff was informed by Arnoff in April 2002 that the hiring managers in the Alexander City office had not selected her for employment. This decision marked the end of the employment relationship between the parties.[4]

---

4. Throughout their briefs, the Plaintiff and Defendant argue over the exact date of the Plaintiff's employment "termination." The Defendant argues that the Plaintiff's job was eliminated in August 2001 due to downsizing, however she remained an employee of the company while she was on medical leave. Once the Plaintiff was able to return to work, the Defendant gave her the opportunity to apply for various positions within the company. The Defendant concludes that her employment formally ended when she was not hired for any of these jobs in April 2002. On the other hand, the Plaintiff contends that she was terminated twice, the first occurring in August 2001 when the Defendant told her that her job had been eliminated, and the second occurring in April 2002 when she was not re-hired by the Defendant into another position.

Under either formulation, two facts stand out when they are viewed most favorably to the Plaintiff. First, the Plaintiff was not permitted to return to her position as a Sales Forecast Analyst after August 2001. Second, the Defendant did not hire or transfer the Plaintiff into any of its available jobs when she returned from her medical leave of absence. Because each of the these actions, regardless of how they are termed in the corporate vernacular, could constitute an un-

## IV. *DISCUSSION*

The Plaintiff asserts two distinct causes of action under Title VII and 42 U.S.C. § 1981.[5] First, the Plaintiff alleges that the Defendant discriminated against her on the basis of her race. *See* 42 U.S.C. § 2000e–2(a) (making it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race"). Second, the Plaintiff alleges that the Defendant retaliated against her for filing complaints with her superiors and the EEOC about the discrimination. *See* 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."). Because the Plaintiff relies entirely upon circumstantial evidence to support her racial discrimination and retaliation claims, the court's analysis will be guided by the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* analysis, the employee must first establish a prima facie case of discrimination or retaliation. *Id.* at 802, 93 S.Ct. 1817. At the second stage, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action. *Tex. Dep't of Cmty. Af-*

*fairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Finally, the employee may seek to demonstrate that the proffered reason was not the true reason for the employment decision either directly by persuading the court that a discriminatory or retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). An employee's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated or retaliated against the employee. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### A. *Race Discrimination Claims*

The Plaintiff argues that four separate incidents during her employment history establish that the Defendant discriminated against her because of her race: 1) the Defendant's refusal to promote the Plaintiff to the senior analyst position; 2) the Defendant's differential treatment toward the Plaintiff with respect to the awarding of vacation time; 3) the changes by Janet Koubek to the Plaintiff's forecasting database files; and 4) the Defendant's disparate treatment toward the Plaintiff with regard to absences from work. Using the *McDonnell Douglas* framework described above, the court will now evaluate each of these claims separately.

---

lawful employment action under Title VII, resolving the semantic dispute between the parties is not required for the disposition of this case.

**5.** Both Title VII and § 1981 have the same requirements of proof and use the same ana-

lytical framework; therefore, the court will address the Title VII claim with the understanding that the analysis applies to the Plaintiff's § 1981 claim as well. *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998).

### 1. *Failure to Promote Claim*

■ In order to establish a prima facie case in a failure to promote claim, the plaintiff must prove the following four elements: 1) that she belongs to a protected class; (2) that she was qualified for a job for which the employer was seeking applicants; 3) that, despite her qualifications, she was rejected; and 4) that, after her rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group. *See Walker v. Mortham,* 158 F.3d 1177, 1186 (11th Cir.1998); *Williams v. Ala. Indus. Dev. Training,* 146 F.Supp.2d 1214, 1219 (M.D.Ala.2001). The first, third, and fourth elements are beyond dispute in this case, as the Plaintiff is an African–American female who was passed over for the senior analyst position for two white employees. Accordingly, the only contested issue between the parties at this stage of the analysis is whether the Plaintiff was "qualified" for the position of Senior Sales Forecast Analyst.[6]

■ When considering whether an employee is qualified for a promotion at the prima facie stage of the *McDonnell Douglas* analysis, the Eleventh Circuit has expressly prohibited the practice of comparing the relative qualifications of the applicants. *Walker,* 158 F.3d at 1192 (holding that the district court erred when it imposed a requirement at the prima facie stage that the plaintiff establish that the successful applicant for her coveted position was less than or equally qualified to hold the position.) "Although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; she need only prove that she herself was qualified to perform the coveted job" in order to establish a prima facie case. *Id.* at 1193; *see Burney v. Rheem Mfg. Co., Inc.,* 196 F.R.D. 659, 670 (M.D.Ala.2000) ("To establish her prima facie case, plaintiff need not show that she was the most qualified person for the position—it is sufficient if she presents evidence that she was minimally qualified.").

■ In the present case, the Plaintiff has met her burden of establishing that she was qualified for the Senior Sales Forecast Analyst position. According to Ronald Davie, Russell's Director of Staff-

---

**6.** The court recognizes that some formulations of the prima facie elements require that the employee actually apply for the promotion in addition to establishing his or her basic qualifications for the position. *See, e.g., Walker v. Prudential Property and Cas. Ins. Co.,* 286 F.3d 1270, 1275 (11th Cir.2002) (holding that an employee did not establish a prima facie case for discrimination because no evidence had been presented that the employee actually applied for the job in question). The rule is based upon the notion that an employer must have notice about an employee's interest in a position in order to discriminate against her. *Id.* Notwithstanding this rule, the Eleventh Circuit has created an exception in situations in which an employer fails to post proper notice of the opening to interested employees. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133–34 (11th Cir.1984). In such cases, an employee's failure to apply for a promotion will not defeat the prima facie case because an employer is presumed to "consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest." *Id.* at 1133. According to the Plaintiff's version of the facts, she did not become aware of the Defendant's desire to hire senior-level analysts until after Harrison and Androutsopoulos began their employment. *See* Gaddis Affidavit, ¶¶ 89–91. Therefore, under *Carmichael,* the Plaintiff's failure to formally apply for the senior analyst position does not bar her prima facie case, because Ronald Davie expressly stated in his deposition that the Plaintiff "expressed interest" and was "given consideration" for the senior analyst position. *See* Davie Depo., p. 20.

ing and Compliance, "[t]he senior forecast analyst job involves primarily the same functions [as the sales forecast analyst job]. The senior forecast analyst position is merely based upon more experience in performing those same duties and functions and working with less supervision." *See* Davie Depo., p. 19. Using this description as a baseline for the job's qualifications, the evidence in the record reveals that the Plaintiff was qualified for the position at the time the Defendant began looking to hire additional employees for the forecasting staff. With regard to employment experience, the Plaintiff had been working in the analyst position for fifteen months, a moderate, but not insignificant period of time. As for the Plaintiff's level of work responsibility, she was the only forecast analyst in the Atlanta office for a portion of this time and her responsibilities included sales forecasting for both the retail and athletic apparel lines. Moreover, the Defendant's admission that it considered the Plaintiff for the senior analyst position leads to the inference that even the Defendant believed that the Plaintiff had the minimal qualifications for the job. *See* Davie Depo., p. 20. Considering all this evidence together, the court is satisfied that the Plaintiff was qualified for the Senior Sales Forecast Analyst position.

Having determined that the Plaintiff met her initial burden of establishing a prima facie case of race discrimination, the burden of production shifts to the Defendant to articulate legitimate, non-discriminatory reasons for the decision not to promote the Plaintiff to the senior analyst position. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The Defendant has met this burden by producing admissible evidence sufficient for the trier of fact to conclude that the Plaintiff was not promot-

ed for three reasons: 1) her lack of qualifications for the senior analyst position; 2) her poor work performance; and 3) her frequent absences from work.[7] Accordingly, the burden shifts back to the Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

The Plaintiff may establish pretext by undermining the credibility of the Defendant's proffered explanations. *See Combs*, 106 F.3d at 1538. Instead of relying on conclusory allegations of discrimination, the Plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." *Id.*

. In this case, the Plaintiff simply challenges the wisdom of the Defendant's hiring decision and has not presented the court with any evidence that the Defendant's stated reasons are unworthy of belief. With respect to the relative qualifications of the candidates, evidence showing that an employer hired a less qualified applicant over the Plaintiff may be probative of whether the employer's proffered reason for not promoting the Plaintiff was pretextual; however, the Plaintiff must establish that she was "substantially more qualified than the person promoted." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000). More specifically, "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face." *Id.* (quot-

---

7. In support of these reasons, the Defendant offered documentary evidence as well as the affidavit and deposition testimony of the two employees responsible for the hiring and recruitment of senior analysts: Randy Ballard and Ronald Davie.

ing *Deines v. Tex. Dep't of Protective and Regulatory Servs.,* 164 F.3d 277, 280 (5th Cir.1999)); *see Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999) (stating that federal courts "are not in the business of adjudging whether employment decisions are prudent or fair. Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

▇ The parties do not dispute that the Defendant was looking for employees with experience in apparel sales forecasting to fill its senior analyst positions. *See* Ballard Affidavit, ¶ 4. Rather, they argue over whether the Plaintiff was more qualified than Harrison and Androutsopoulos for the senior analyst position. The Plaintiff believes that she was more qualified for the following reasons: 1) she trained Harrison and Androutsopoulos on the computer software; 2) Rick Gardner, the president of Russell, regularly told the Plaintiff that she was doing a good job; 3) she has a masters degree; and 4) she had five years of forecasting and analyst experience though her work with the Defendant and several other companies. Although all of these facts are undisputed, they do not establish that the Plaintiff's credentials so far exceeded those of Harrison and Androutsopoulos such that no reasonable person, in the exercise of impartial judgment, could have chosen Harrison and Androutsopoulos over the Plaintiff for the job in question. *See Lee,* 226 F.3d at 1253. With respect to prior experience in the apparel industry, the Plaintiff had none prior to joining Russell, while both Harrison and Androutsopoulos had worked over

fifteen years with multi-national manufacturers such as Polo, Mizzuno, and Cluett Peabody & Co. Furthermore, a review of their respective resumes reveals that Harrison and Androutsopoulos worked for several years in apparel forecasting and analysis, yet the Plaintiff had only thirty months of inventory forecasting experience for a cable television company. Although the Plaintiff produced some evidence of her advantageous qualities—a graduate degree, positive remarks from superiors, and training new employees on the computer software—she has not established that her qualifications were so superior to those of Harrison and Androutsopoulos that a reasonable juror could infer discriminatory intent from a comparison of their respective credentials. Accordingly, the Plaintiff has not met her burden of proving that the Defendant's first proffered reason for denying her the promotion was a pretext for race discrimination.

▇ As its second reason for not promoting the Plaintiff, the Defendant cites the Plaintiff's poor work performance reviews. In support of this position, the Defendant presents a performance evaluation from Randy Ballard dated February 6, 2001[8] in which the Plaintiff received mostly twos and threes on a five point scale.[9] The Plaintiff attempts to prove that this reason is pretextual by presenting evidence that her negative performance review was inconsistent with the informal comments that she received from other employees.[10] At most, however, this evidence only establishes that the Plaintiff had a subjective perception that other employees believed that she was doing a good

---

**8.** The date of this evaluation is critical as it is the one that most closely corresponds to the timing of the Defendant's decision to hire senior analysts.

**9.** According to the legend on the evaluation, a two rating means "needs improvement" and three rating means "meets expectations."

**10.** As evidence of this positive feedback, the Plaintiff has presented the court with a random sampling of e-mails in which various employees made remarks such as "You're great!!!" and "You're the best!!!"

job when asked to accomplish certain projects. According to the Eleventh Circuit, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir.1997). Therefore, when "the employer produces performance reviews ... that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence." *Id.*

■■■ In essence, the Plaintiff attempts to create an issue of fact by presenting evidence that various Russell employees differed in their assessment of the Plaintiff's work performance. As a result of this difference of opinion, the Plaintiff argues that Ballard's formal evaluation must be incorrect because he did not interact with the Plaintiff on a daily basis like the other employees who gave her positive feedback. The central problem with this line of reasoning is that it fails to recognize that proving pretext requires more than showing that the employer based its decision on an inaccurate assessment of the Plaintiff's work performance. *See Curtis v. Teletech Customer Care Mgt., Inc.,* 208 F.Supp.2d. 1231, 1245 (N.D.Ala.2002). As the Eleventh Circuit has explained, federal courts were not created to sit as "super-personnel department[s] that re-examine[ ] an entity's business decisions." *Alphin v. Sears, Roebuck & Co.,* 940 F.2d 1497, 1501 (11th Cir.1991) (citations omitted). Rather, they only determine whether the employer gave an honest, non-discriminatory explanation of its behavior. *Id.; see Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir.2002) (stating that federal courts must be careful not to allow employees to litigate whether they are good employees; rather, they must only determine whether the employer's decision was honest). In this respect, the only evidence the Plaintiff has presented to call the Defendant's stated reason into question is her own affidavit testimony that she was doing a good job and a random sampling of positive e-mails from non-supervisory employees,[11] both of which have no impact on the Plaintiff's formal evaluation.[12] Because the Plaintiff has not produced any evidence from which to infer that Ballard's job performance evaluation is somehow false or unworthy of belief, the Plaintiff cannot establish pretext with her proffered evidence.

■■■■ The Defendant's final reason for not promoting the Plaintiff is her excessive absences from work. In support of this contention, the Defendant produced a document log created by the Plaintiff's supervisor, Elizabeth Robinson, indicating that the Plaintiff missed work on 46 different occasions between January 2000 and March 2001. In an attempt to establish pretext, the Plaintiff disputes the accuracy of Defendant's attendance records with conclusory statements in her affidavit that these documents are "false."[13] *See* Gaddis

---

**11.** None of these e-mails were written by the Plaintiff's supervisors.

**12.** According the Eleventh Circuit, "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Holifield,* 115 F.3d at 1564–65 (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 10 (1st Cir.1990)). Extending this rationale to its logical extreme, the reverse positions must also be true: the favorable reviews of non-decisionmakers are irrelevant to the challenged employment action.

**13.** As previously discussed, the racial biases of those who neither make nor influence the challenged personnel decision are not relevant in an employment discrimination case *Holifield,* 115 F.3d at 1564–65. Although the Plaintiff stated in her deposition that she heard David Floum make a racially derogatory remark about her, the Plaintiff has produced no evidence indicating that Floum had any input in the Defendant's decision not to

Affidavit, ¶ 21. In addition, her deposition testimony identified approximately ten specific dates that she did not recall being absent. Other than these ten days, the Plaintiff has not identified which specific entries in the Defendant's records are "false" or offered any facts within her personal knowledge to dispute these records. Therefore, according the Plaintiff's facts, she was absent approximately 36 times instead of 46 times. Although this evidence calls the factual accuracy of the Defendant's attendance records into question, it does little to undermine the ultimate reason why the Plaintiff did not receive a promotion: excessive absences. Stated differently, the Plaintiff has not produced any evidence that challenges the Defendant's explanation that she missed too many days of work to receive a promotion.[14] *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1536 (11th Cir.1997) (discussing a hypothetical situation posed in opinion in *Isenbergh v. Knight–Ridder Newspaper Sales, Inc.*, 97 F.3d 436 (11th Cir.1996), in which a plaintiff who successfully produced evidence that she was late seven days instead of nine days cannot survive summary judgment because she

has not undermined the ultimate reason for her termination: excessive lateness). In the end, because the Plaintiff has not undermined the truthfulness of any of the Defendant's stated reasons, summary judgment is due to be GRANTED in favor of the Defendant as to the Plaintiff's failure to promote claim.

### 2. *Vacation Time*

■ The Plaintiff's second disparate treatment claim is based upon racial discrimination in the awarding of vacation time. In support of this claim, the Plaintiff argues that the Defendant permitted a white employee, Elizabeth Robinson, to carry over vacation days into the next year, but denied the Plaintiff this same privilege. Additionally, the Plaintiff contends that she did not receive all of her promised vacation time. Even assuming that these facts are true, the Plaintiff cannot prevail on this claim because she has not established a prima facie case of race discrimination.

■ A plaintiff establishes a prima facie case of such race discrimination by demonstrating that: 1) she belongs to a

---

promote her. In fact, the undisputed facts indicate that Randy Ballard made the decision on his own. *See* Ballard Affidavit, ¶ 3–4. Therefore, the Plaintiff cannot point to Floum's comment as evidence of race discrimination in connection with her failure to promote claim.

**14.** Even assuming that the Plaintiff's statements are correct and create an issue of fact as to how many days of work she missed, the Plaintiff is unable to defeat summary judgement because of rule announced in *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997). Under *Combs*, in order to survive a motion for summary judgment at the pretext stage, a plaintiff must create a question of fact as to whether *each* of the Defendants articulated reasons is unworthy of credence. *Lewis v. Chattahoochee Valley Cmty. College*, 136 F.Supp.2d 1232, 1241 (M.D.Ala.2001) (em-

phasis added). This rule is directly applicable to this case because the Defendant has offered multiple reasons for its decision not to promote the Plaintiff, any one of which would independently account for its actions. *Strickland v. Prime Care of Dothan*, 108 F.Supp.2d 1329, 1334 (M.D.Ala.2000). Indeed, even assuming that the Plaintiff's work performance evaluation was "intertwined" with her attendance record, the fact that the Plaintiff was not as qualified for the promotion as either Harrison or Androutsopoulos is sufficiently independent of either of the two aforementioned reasons to warrant granting summary judgment in favor of the Defendant. *Id.* at 1334–35 (stating that when "multiple grounds offered by the defendant" are not truly independent but are "so intertwined" that the taint created by an issue of fact as to one such reason undermines the other reasons as well, summary judgment must be denied).

protected class; 2) she has engaged in conduct similar to that of persons outside of the protected class; and 3) similarly situated persons outside of the protected class received more favorable treatment. *Smith v. Int'l Paper Co.,* 160 F.Supp.2d 1335, 1340 (M.D.Ala.2001). In this case, the Plaintiff has not produced sufficient evidence to prove that she and Elizabeth Robinson were similarly situated employees.

Under Eleventh Circuit precedent, if two employees are not similarly situated, then the different application of workplace rules does not constitute illegal discrimination. *Lathem v. Dep't of Children & Youth Servs.,* 172 F.3d 786, 793 (11th Cir.1999). In order to determine whether employees are similarly situated for purposes of a prima facie case, a court must consider whether the employees are involved in the same or similar conduct and are treated in different ways. *See Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir.2001). Moreover, the comparator's conduct must be nearly identical to the plaintiff's so that courts will not second-guess an employer's reasonable decisions. *Id.*

The Plaintiff has not produced any evidence indicating that she and Robinson were similarly situated employees with respect to the awarding of vacation time. Pursuant to a company-wide policy, the Defendant allowed Robinson to carry over one vacation day into 2001 because she worked on one of her scheduled vacation days in 2000. *See* Arnoff Affidavit, ¶ 5. In contrast, the Plaintiff has not produced any evidence that she worked on one of her vacation days so that she would be entitled to carry over additional vacation days. Absent such evidence, the Plaintiff cannot establish that she was similarly situated to Robinson.

With regard to the claim that the Plaintiff did not receive all of her vacation time, the Plaintiff has either alleged nor drawn the court's attention to any similarly situated employees who received all of their vacation days. Indeed, the Plaintiff ignores the undisputed fact that the Defendant changed its calculation of vacation days for all employees in 2000. *See* Arnoff Affidavit, ¶ 5. Because the Plaintiff has not established that a similarly situated employee received more favorable treatment as to the computation of vacation days, the Plaintiff cannot establish a prima facie case and summary judgment is due to be GRANTED in favor of the Defendant as to this claim.

### 3. Changes to the Plaintiff's Work Product by Janet Koubek

The Plaintiff's third claim of race discrimination is based upon differential treatment she received from Janet Koubek. The Plaintiff argues that Koubek changed the information in some of the Plaintiff's database files in order to undermine her performance because of her race. Nevertheless, the Plaintiff is unable to sustain a prima facie case with respect to this treatment, because it did not rise to the level of adverse employment action.

In order to establish adverse employment action for purposes of a prima facie case of race discrimination in employment, a plaintiff must present evidence of a serious and material change in the terms, conditions, or privileges of employment. *Davis v. Town of Lake Park,* 245 F.3d 1232, 1239 (11th Cir.2001). Although the Plaintiff was upset with Koubek's actions, the record does not contain any evidence of how Koubek's conduct impacted on the Plaintiff's employment. *See Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996) (stating that "not everything that makes an employee unhappy is an actionable adverse action"). For example, the Plaintiff has not even alleged that Koubek's conduct affected Ballard's evaluation

of her job performance or her ability to obtain the senior analyst promotion. *See Merriweather v. Ala. Dep't of Pub. Safety,* 17 F.Supp.2d 1260, 1271 (M.D.Ala.1998). In fact, the Plaintiff even concedes in her affidavit that these actions did not have a tangible impact on her: "This would affect my employment if I would not have noticed what Janet was doing." *See* Gaddis Affidavit, ¶ 103. Due to the absence of any material change in the Plaintiff's employment status as a result of Koubek's actions, the Plaintiff cannot establish her prima facie case. Therefore, summary judgment is due to be GRANTED in favor of the Defendant as to this claim.

### 4. Absences from Work

■ Finally, the Plaintiff alleges that the Defendant treated her differently than white employees with respect to discipline for work absences. More specifically, the Defendant permitted Androutsopoulos "to leave work frequently for hours on end without being disciplined," yet cautioned the Plaintiff about every absence and eventually placed her on probation due to her poor attendance.[15] *See* Complaint ¶ 13.

■ To establish a prima facie case of disparate discipline, a plaintiff must demonstrate: 1) that she belongs to a protected class; (2) that she is qualified for the job; and 3) that a similarly situated employee engaged in the same or similar conduct and did not receive similar discipline. *Alexander v. Fulton County,* 207 F.3d 1303, 1336 (11th Cir.2000). Once again, the Plaintiff is unable to establish a prima facie case because she has not produced any evidence indicating that she and

Bill Androutsopoulos were similarly situated employees who engaged in similar misconduct.

■ In evaluating whether employees are similarly situated within the context of a disparate discipline claim, the most important factors to consider are the "nature of the offenses committed and the nature of the punishments imposed." *Silvera,* 244 F.3d 1253, 1259 (11th Cir.2001) (internal citations and quotations omitted). As to the nature of the offenses committed, the Defendant punished the Plaintiff due to her frequent *unexcused absences* from work altogether.[16] *See* Floum Affidavit, ¶ 3. For example, a sampling of the Defendant's attendance records indicate that the Plaintiff missed work because of illness, her daughter's illness, car trouble, and personal finance business. Conversely, the Plaintiff's disparate treatment complaint is based on the fact that the Defendant permitted Androutsopoulos to leave work during his lunch hour to go jogging. *See* Gaddis Depo., p. 170. Moreover, the Plaintiff has not even alleged nor pointed to court to any evidence that these long lunches were unexcused. Because these two types of absences are entirely unrelated to each and do not have a sufficient degree of factual similarity to warrant a finding that the Plaintiff has met her burden of setting forth a prima facie case, summary judgment is due to be GRANTED in favor of the Defendant on this claim.

### B. Retaliation Claims

■ In addition to her claims for disparate treatment, the Plaintiff also alleges

---

**15.** Although the Plaintiff's affidavit references two other white employees who also missed time at work, the court grants the Defendant's Motion to Strike (Doc. # 31) these statements on the ground that they are not founded upon personal knowledge.

**16.** The court rejects the Plaintiff's contention that the records reflecting the Plaintiff's absences are inadmissible, because these documents fall within the business records exception of Federal Rule of Evidence 803(6). *See* Gaddis Depo., Exhibit 4 & 6.

that the Defendant retaliated against her after she complained to her supervisors and the EEOC about what she perceived to be racial discrimination. To establish a prima facie case of retaliation under Title VII, a plaintiff must establish the following elements: 1) she engaged in statutorily protected expression; 2) she suffered an adverse employment action; and 3) the existence of a causal connection between the two events. *Brochu v. City of Riviera Beach,* 304 F.3d 1144, 1155 (11th Cir.2002). Once the plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to produce legitimate, non-retaliatory reasons for the adverse employment action. *Id.* If the defendant meets this burden of production, the plaintiff has a final opportunity to prove that the Defendant's proffered reasons are a pretext for retaliation. *Id.*

Title VII contains two related, yet distinct anti-retaliation prohibitions. The "participation clause" protects against discrimination when the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a). Conversely, the "opposition clause" protects an employee who merely has "opposed any practice made an unlawful employment practice" under Title VII. *Id.* Although both clauses require the same elements for a prima facie case, the degree of expression protected under each clause differs. Therefore, in order to properly analyze the first element of the Plaintiff's prima facie case, the court must first determine whether the Plaintiff engaged in any activity protected by either clause.

■ The participation clause protects employees from retaliatory actions that oc-

cur in conjunction with or after the filing of a formal charge with the EEOC. *See E.E.O.C. v. Total Sys. Servs., Inc.,* 221 F.3d 1171, 1174 (11th Cir.2000). In this case, the Plaintiff filed her EEOC complaint on August 14, 2001, thus her protection against retaliation under the participation clause began on this date.

■ In contrast to the participation clause, Title VII's opposition clause protects a broader range of expression. According to the Eleventh Circuit, this provision protects employees "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. Fla. Dep't of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989). The Plaintiff has met this requirement in this case as she has produced evidence of two meetings with her superiors in February 2001 in which she expressed her belief that she was the victim of race discrimination.[17] First, the Plaintiff met with Randy Ballard and responded in the affirmative when he asked if the Plaintiff believed that her differential treatment was because of her race. *See* Gaddis Depo., p. 208. Second, the Plaintiff met with Ronald Davie and told him that she was being "racially attacked." *Id.* at 210.

■ In addition to simply voicing complaints about discrimination to supervisors, the Eleventh Circuit requires an employee seeking opposition clause protection to establish that she had "a good faith, reasonable belief that the employer has engaged in unlawful discrimination." *Little v. United Technologies, Transicold Div.,* 103 F.3d 956, 960 (11th Cir.1997). This standard involves both a subjective

---

17. In her deposition, the Plaintiff stated that she had these meetings "after Bill was hired." *See* Gaddis Depo., p. 208. Viewing the facts in a light most favorable to the Plaintiff, these meeting took place sometime during February 2001. *See id.* at 134 (stating that Harrison and Androutsopoulos began their employment in February 2001).

and objective component. "A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

In this case, nothing in the record indicates that the Plaintiff had anything other than a subjective good faith belief that she was the victim of racial discrimination. Therefore, deciding whether the Plaintiff has established the first element of her prima facie case for retaliation hinges on the objective reasonableness of her belief that the Defendant engaged in unlawful employment activity. Before engaging in this discussion, however, a threshold question must be answered: how much of the Defendant's adverse conduct may the court consider at this stage of the analysis?

■ According to the Eleventh Circuit, the only adverse conduct that is relevant to the opposition clause inquiry is that which the Plaintiff actually opposed. *See Clover,* 176 F.3d at 1352. Conduct that has yet to occur or that is unknown to the Plaintiff must not be considered in evaluating the objective reasonableness of the Plaintiff's belief that the employer engaged in unlawful employment action. *See id.* As discussed earlier, the Plaintiff first voiced her opposition to the Defendant's alleged discrimination in February 2001 during her two meetings with Ballard and Davie. Therefore, the court must confine its analysis to only those actions of the Defendant that were both known to the Plaintiff and took place prior to this date.

■ Viewing the facts most favorably to the Plaintiff, the record reveals that the Plaintiff's complaints of race discrimination were based on the following pre-February 2001 events: 1) the hiring of Harrison and Androutsopoulos; 2) negative job evaluations from Ballard; 3) the alteration of database files by Janet Koubek; and 4) the reduction in vacation days. The fact that the court has granted summary judgment in favor of the Defendant as to these claims is not determinative of the reasonableness issue. Rather, the court must only decide whether this conduct is sufficiently close enough to judicially cognizable racially discriminatory conduct to warrant a finding that the Plaintiff's belief was objectively reasonable. *See id.* at 1351 ("The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.").

Evaluating the Defendant's conduct as a whole, the Plaintiff's belief that she was the victim of racial discrimination was objectively reasonable. The Plaintiff was the only African–American member of the forecasting staff and had experience with all of the Defendant's product lines, yet she was passed over for the senior analyst position for two white employees from outside the company. Furthermore, Janet Koubek had the propensity to alter only the Plaintiff's files, not the files of white employees. Indeed, the disparity between Ballard's informal comments and his formal evaluations only added to the Plaintiff's suspicions of race discrimination. Taken together, the court is satisfied that the Plaintiff had an objectively reasonable belief that the Defendant had engaged in judicially recognized race discrimination. Accordingly, the Plaintiff has established that she engaged in protected activity recognized by Title VII.

■ As for the second element of the prima facie case, the Plaintiff must

establish that the Defendant took an adverse employment action against her. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000) (citation and marks omitted). "Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality ... to be cognizable under the anti-retaliation clause'" of Title VII. *Id.* (quoting *Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998)). In evaluating what actions meet this substantiality threshold, courts must examine the record for "objectively serious and tangible actions" and be cognizant of the fact that "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Id.* at 587–88 (citations and quotations omitted).

In support of her retaliation claim, the Plaintiff contends that the Defendant engaged in six adverse employment actions: 1) eliminating her job; 2) refusing to place her in a new position once she returned from her medical leave of absence; 3) terminating her short-term health care benefits; 4) placing her on probation for excessive absences; 5) opposing her request for unemployment benefits from the State of Georgia; and 6) refusing to grant her request to transfer her job to the Alexander City office. Nevertheless, the final two actions on this list do not rise to the level of judicially recognized adverse employment actions.[18]

 With regard to the Plaintiff's argument that the Defendant retaliated against her by opposing her request for unemployment insurance benefits, the Plaintiff has not presented the court with any evidence that this action caused her either serious or tangible harm. After the Defendant informed the Plaintiff that her job had been eliminated in August 2001, the Plaintiff applied for unemployment benefits through the Georgia Department of Labor. The Defendant opposed this application because it believed that the Plaintiff remained an employee of the company as a result of her "Medical Leave of Absence" status. Despite this argument, the Georgia Department of Labor concluded that the Plaintiff was "discharged due to a lack of work" and awarded her unemployment benefits. *See* Plaintiff's Exhibit 4.

The fact that the Plaintiff ultimately prevailed in her unemployment dispute is critical to the disposition of her retaliation claim. In addressing the same issue now before this court, the United States District Court for the Northern District of Alabama concluded that the employer's mere opposition to an employee's request for unemployment benefits, "in and of itself, does not constitute an adverse action unless the employer prevails. Otherwise, the Plaintiff has not been harmed—, i.e., her right to receive unemployment benefits is unimpaired." *Bevill v. UAB Walker College,* 62 F.Supp.2d 1259, 1280 (N.D.Ala. 1999); *see Baker v. Summit Unlimited, Inc.,* 855 F.Supp. 375, 376 (N.D.Ga.1994) (holding that the "Defendants' opposition

---

**18.** Rather than engage in an extended analysis as to the other four alleged acts of retaliation, the court will assume, without deciding, that they rise to the level of unlawful employment actions for purposes of the Plaintiff's prima facie case.

to Plaintiff's claim for unemployment benefits ... is not retaliatory in nature and therefore not a basis for a claim under Title VII"). In this case, the Plaintiff concedes the fact that she received her benefits, but attempts to circumvent this reality by arguing that the Defendant's opposition delayed her receipt of the money and caused her emotional trauma. This argument is unpersuasive because Title VII does not recognize this type of harm as actionable. *See Gupta,* 212 F.3d at 587 (stating that adverse employment action must alter "the employee's compensation, terms, conditions, or privileges of employment, deprive[ ] him or her of employment opportunities, or adversely affect[ ] his or her status as an employee").

In addition to the absence of any cognizable harm to the Plaintiff, the Defendant's opposition was not retaliation, but an exercise of its legal rights under Georgia law. Once the Plaintiff initiated her request for unemployment benefits, the Defendant responded as required. *Baker,* 855 F.Supp. at 376. Such opposition was certainly the employer's right and not retaliatory in nature. *Id.* Accordingly, the Plaintiff cannot sustain a cause of action under Title VII based on the Defendant's opposition to her request for unemployment benefits because she has not established that this conduct constitutes unlawful employment action.

 The Plaintiff is also unable to prove that the Defendant engaged in unlawful employment action when it refused to transfer her to the Alexander City office. As to the specific nature of the Plaintiff's request, the record reveals that she wanted to perform her analyst position out of the Alexander City office rather than Atlanta. *See* Gaddis Depo., Exhibit 10. The Plaintiff did not request a transfer to

another position, nor did she ever give any indication that she would be willing to accept an equal or lesser position in Alexander City. *Id.* In short, the Plaintiff wanted a lateral transfer of her position from Atlanta to Alexander City.

 A purely lateral transfer—a transfer that does not involve a demotion in form or substance—does not rise to the level of an adverse employment action. *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1449 (11th Cir.1998). "A transfer to a different position can be adverse if it involves reduction in pay, prestige, or responsibility." *Smith v. Ala. Dept. of Corrs.,* 145 F.Supp.2d 1291, 1298 (M.D.Ala. 2001). "The flip side of this coin would appear to be that a failure to transfer may constitute an adverse employment action if [the new position] entails an increase in pay, prestige or responsibility." *Morris v. Wallace Cmty. Coll.,* 125 F.Supp.2d 1315, 1328 (S.D.Ala.2001). Put simply, the position to which the employee was denied a transfer, must entail a serious and material change in the terms, conditions, or privileges of employment in order for a plaintiff to state a prima facie case of retaliation. *Smith,* 145 F.Supp.2d at 1299.

 In similarity to *Smith,* the Plaintiff in this case has not argued that the position she would have occupied in Alexander City was a promotion. More important, she has failed to point the court to any evidence that addresses any differences in pay, benefits, job duties, or responsibilities as between her current job and the job to which she sought to transfer. Indeed, the Plaintiff is unable to produce such evidence because she only requested that the Defendant allow her to conduct her same job in Alexander City instead of Atlanta. Because the Defen-

dant's refusal to grant this request did not adversely impact the terms or conditions of the Plaintiff's employment, the Plaintiff cannot make out a prima facie case of retaliation as to this claim.[19]

Having determined that two of the Plaintiff's alleged acts of retaliation do not rise to the level of unlawful employment actions, the court must examine whether the Plaintiff has established the final element of her prima facie case: the existence of a causal connection between the her protected activity and the Defendant's four assumed unlawful employment actions. As discussed earlier, the Plaintiff engaged in two types of expression protected by Title VII. First, the opposition clause protects the Plaintiff against retaliation stemming from her oral complaints about racial discrimination to her supervisors in February 2001. Second, the participation clause protects her against retaliation connected to the filing of her EEOC complaint on August 14, 2001. Because the Plaintiff has not identified which of the four adverse actions are causally connected to which of the two acts of expression, the court will analyze each act of expression separately.

■ To prove a causal connection, a plaintiff is required to demonstrate "that the protected activity and the adverse action were not wholly unrelated." *Clover,*

176 F.3d at 1354 (internal quotations omitted). A plaintiff satisfies this requirement if she provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action. *Id.* With respect to the Plaintiff's oral complaints of race discrimination, the Plaintiff directed these remarks to two of her supervisors, thus the court is satisfied that the Defendant was aware of her protected conduct.

■ As for the temporal proximity requirement, the Plaintiff is unable to establish the requisite connection for three of the four alleged adverse employment actions. First, the Defendant eliminated the Plaintiff's job in August 2001—six months after she first voiced her complaints in February 2001. Second, the Defendant terminated the Plaintiff's short term health benefits in September 2001—seven months after her complaints. Third, the Defendant did not hire the Plaintiff into another position within the company following her return from medical leave in April 2002—fifteen months after her complaints. These lapses of time between the Plaintiff's protected activity and the Defendant's adverse action are too long to establish the requisite causal connection. *See Clark County Sch. Dist. v. Breeden,*

---

**19.** Although the Plaintiff's brief is unclear on this point, the court rejects any argument that the Plaintiff has established a prima facie case of intentional discrimination based on the Defendant's failure to transfer her to Alexander City. As discussed earlier, a plaintiff attempting to make out a prima facie case of disparate treatment must establish that similarly situated persons outside of the protected class received more favorable treatment. *Smith v. Int'l Paper Co.,* 160 F.Supp.2d 1335, 1340 (M.D.Ala.2001). Although the Plaintiff argues that the Defendant permitted two white em-

ployees to transfer their same jobs to the Alexander City office, the Plaintiff has not produced any evidence indicating that she was similarly situated to these employees. First, Monty Gibbs was a merchandising manager, not a forecast analyst Second, Elizabeth Robinson was the manager of forecasting and the Plaintiff's direct supervisor. Because these two employees occupied managerial positions quite different from the Plaintiff's junior analyst position, the Plaintiff cannot establish a prima facie case of disparate treatment on this claim.

532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (citing affirmatively several court of appeals cases for the proposition that a three to four month gap is insufficient to establish a causal connection); *Malone v. K–Mart Corp.*, 51 F.Supp.2d 1287, 1307 n. 13 (M.D.Ala.1999) (citing cases for the proposition that a four to six month lapse is insufficient to establish a causal connection).

 Notwithstanding this conclusion, the two month gap between the Plaintiff's oral complaints and probationary status is sufficient to establish the temporal proximity requirement. Viewing the facts most favorably to the Plaintiff, she articulated her complaints of race discrimination to her supervisors in February 2001 and the Defendant placed her on probation on March 29, 2001. Due to the close proximity between these two events, the Plaintiff has established a prima face case of retaliation stemming from her oral complaints only with respect to the imposition of probation.

Addressing the Plaintiff's participation clause retaliation claim, the Plaintiff filed her EEOC complaint on August 14, 2001, thus any adverse action that took place prior to this date cannot be retaliatory. *See Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir.2000) (holding that adverse action that takes place before the employee's protected expression cannot form the basis of a Title VII retaliation claim). Of the four adverse actions, only the imposition of probation for excessive absences on March 29, 2001 occurred before the Plaintiff filed her EEOC complaint. Therefore, this adverse action cannot form the basis of the Plaintiff's participation clause claim.

 Additionally, the lapse between the EEOC complaint and the Defendant's failure to place the Plaintiff in a different job after she returned from her medical leave of absence is too long to meet the temporal proximity requirement. Under the Plaintiff's version of the facts, the Defendant refused to place her in a new job in April 2002—eight months after she filed her EEOC complaint. Because this length of time is insufficient to establish temporal proximity, the Plaintiff has not established a prima facie case on this claim. *See Breeden*, 532 U.S. at 273–74, 121 S.Ct. 1508.

 With regard to the final two adverse actions forming the basis of her participation clause claim—elimination of her job and denial of health benefits—the Plaintiff has set forth enough evidence to establish a causal connection and, therefore, a prima facie case of retaliation. As to the termination of her short-term health benefits, the record reveals that this event occurred in September 2001, approximately one month after she filed her EEOC complaint. This lapse of time is sufficient to establish a causal nexus between the Plaintiff's protected activity and the Defendant's adverse action.[20] *See, e.g., Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986) (holding that a one month gap between protected activity and adverse action is sufficient to establish a causal connection).

As to the elimination of the Plaintiff's job, both parties agree that this event

---

**20.** The Defendant has not argued that it was unaware of the Plaintiff's EEOC complaint at the time it terminated her short term health benefits or eliminated her job. Accordingly, the court will assume, without deciding, that the Defendant was aware that the Plaintiff had filed an EEOC complaint when it took these actions.

occurred at some point in August 2001, yet the record does not reveal an exact date. This date is important because the Plaintiff filed her EEOC complaint on August 14, 2001. If the Defendant eliminated the Plaintiff's job prior to this date, she cannot maintain a retaliation claim due to the absence of a causal connection between the two events. Viewing the facts in a light most favorable to the Plaintiff, however, the submissions of the parties indicate that the Plaintiff filed her EEOC complaint prior to receiving notice of her termination. According to her affidavit, the Plaintiff states that Randy Ballard terminated her job in mid-August 2001 because she filed an EEOC charge against the Defendant. *See* Gaddis Affidavit, ¶ 63. A reasonable inference from this statement of fact is that the Plaintiff filed her complaint prior to receiving notice of her job's termination. Under this view of events, the temporal proximity between the filing of the EEOC charge and the elimination of the Plaintiff's job was only a few weeks, if not a few days Therefore, the Plaintiff has met her burden of establishing a prima facie case as to this adverse action.

To summarize, the Plaintiff has established a prima facie case of retaliation on limited portions of her claims. First, under the opposition clause, the Plaintiff has met her prima facie burden only with respect to her placement on probation for excessive absences. Second, under the participation clause, the Plaintiff has established a prima facie case with respect to the elimination of her job in August 2001 and the termination of her health care benefits in September 2001. Accordingly, only these two claims will proceed to the second step of the *McDonnell Douglas* analysis. Summary judgment is therefore due to be GRANTED in favor of the Defendant on all other retaliation claims.

As discussed earlier, at the second stage of the *McDonnell Douglas* analysis, the burden of production is placed upon the employer to articulate a legitimate non-retaliatory reason for its employment action. *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089. In this case, the Defendant has met this burden for all three of the alleged retaliatory acts. First, the Defendant maintains that it placed the Plaintiff on probation due to her excessive absences from work. Second, the Defendant states that it was not responsible for terminating the Plaintiff's health care benefits. Instead, the Defendant simply passed on medical information submitted by the Plaintiff to its insurance carrier, which ultimately made the final decision regarding coverage. Third, the Defendant eliminated the Plaintiff's job due to a corporate mandate that the Defendant's Atlanta office reduce costs and Randy Ballard's assessment that the Plaintiff was the least valuable person in the forecasting unit at the time of this directive.

Because the Defendant met its burden of production as to all three claims, the burden of proof shifts back to the plaintiff to raise a genuine factual issue as to whether the Defendant's proffered reasons are "a pretextual ruse to mask a retaliatory action." *See Raney v. Vinson Guard Service, Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997). In order to meet this burden, the Plaintiff must produce evidence that creates a triable issue of fact as to the truthfulness of the Defendant's proffered explanations. *Garcia–Cabrera v. Cohen,* 81 F.Supp.2d 1272, 1282 (M.D.Ala.2000). The reasonableness of the decision maker's belief is not at issue in employment suits, thus the question of whether an employer's honest belief has a basis in fact is not a proper question to be considered on summary judgment. *Id.* Therefore, "[n]o mat-

ter how medieval a firm's practices, no matter how highhanded its decisional process, no matter how mistaken the firm's managers, the [employment laws] do[ ] not interfere. Rather, [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)). Employing this standard, the court will now consider each of the Plaintiff's three pretext arguments in turn.

### 1. *Probation For Excessive Absences*

■ The Plaintiff has not produced enough evidence to create a triable issue of fact as to the veracity of the Defendant's stated reason that it placed the Plaintiff on probation for excessive absences. As discussed in connection with her disparate treatment claim, the Plaintiff only disputes the Defendant's assertion that she was absent 46 days over a fifteen month period. In short, the Plaintiff believes she was absent fewer than 46 days while the Defendant maintains that this figure is accurate. Even assuming that the Plaintiff is correct when she states that she "did not have 32 absences in 2002 nor ... 14 absences as of March 14," this statement does not undermine the truthfulness of the Defendant's belief that she did. Instead, it only establishes her own subjective belief that she had fewer absences than the Defendant's records indicate. Such evidence does not create a factual issue as to whether the Defendant's probation decision was

truly motivated by the Plaintiff's attendance record. Accordingly, summary judgment in favor of the Defendant is due to be GRANTED as to the Plaintiff's opposition clause claim.

### 2. *Termination of Health Benefits*

■ With regard to the issue of health care benefits, the Plaintiff's affidavit states that the Defendant terminated her coverage by falsely informing its insurance carrier that she was able to return to work in the fall of 2001. *See* Gaddis Affidavit, ¶¶ 43, 65. The Defendant has moved to strike these statements because the Plaintiff lacks personal knowledge about the exchange of information that took place between the Defendant and its insurance company. The court agrees with the Defendant and will disregard these statements as the record is devoid of any evidence indicating how the Plaintiff has personal knowledge about communications that took place outside of her presence.[21] Absent these statements, the Plaintiff cannot establish pretext because the record does not contain any other evidence challenging the Defendant's asserted reason that it was not responsible for the termination of her benefits. Accordingly, summary judgment is due to be GRANTED in favor of the Defendant as to this claim.

### 3. *Job Elimination*

■ Finally, the Plaintiff has not directed this court to any evidence indicating that the Defendant's decision to eliminate

---

**21.** The Defendant filed a Motion to Strike (Doc #31) 53 different statements in the Plaintiff's Affidavit on November 30, 2002. The court issued a show cause Order giving the Plaintiff until December 2, 2002 to respond. This date has come and gone without any response from the Plaintiff. Accordingly, the court will grant the Defendant's motion. *See* Section 6, Uniform Scheduling Order entered on March 4, 2002 ("The failure to file a response to any motion ... within the time allowed by the court shall indicate that there is no opposition to the motion.")

her position in August 2001 was a pretext for retaliation. Acting under a corporate order to cut costs, Randy Ballard stated that he made this decision for three reasons: 1) the Plaintiff's poor job evaluations; 2) the Plaintiff's frequent absences from work; and 3) the Plaintiff's relative lack of experience in the apparel industry as compared to the other employees in the group. *See* Ballard, ¶ 10. As discussed more fully in connection with her failure to promote claim, *See supra* pp. 1136–1139, the Plaintiff has not come forward with any evidence that questions the veracity of these reasons or reveals any retaliatory animus on the part of the Defendant. *See Holifield,* 115 F.3d at 1565. As a result of this failure to create a triable issue of fact as to the Defendant's asserted reasons, summary judgment in favor of the Defendant is due to be GRANTED on this claim.

## V. *CONCLUSION AND ORDER*

For the reasons stated above, the Defendant's Motion for Summary Judgment is due to be GRANTED as to all of the Plaintiff's disparate treatment and retaliation claims, and it is hereby ORDERED as follows:

1. Defendant's Motion to Strike (Doc. # 31), directed to statements contained in Plaintiff's Affidavit is GRANTED.

2. Defendant's Motion for Summary Judgment is GRANTED as to all of Plaintiff's claims.

3. Final Judgment will be entered in favor of the Defendant.

4. Costs are taxed against the Plaintiff.

## *FINAL JUDGMENT*

In accordance with the Memorandum Opinion and Order entered on this day granting the Defendant's Motion for Summary Judgment,

Judgment is hereby entered in favor of the Defendant, Russell Corporation, and against the Plaintiff, Rico Gaddis.

Costs are taxed against the Plaintiff.